## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROLLIN DYE, individually and on behalf of all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No.** |
| **FORD MOTOR COMPANY,** | ) ) | |
| **Defendant.** | ) | **Jury Demanded** |

## COMPLAINT

Plaintiff Rollin Dye, individually and on behalf of all others similarly situated, by his attorneys Favaro & Gorman, Ltd., pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, ("FLSA"), the Illinois Minimum Wage Law, 820 ILCS 105/1, *et seq.* ("IMWL"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* ("Wage Act"), complains of defendant Ford Motor Company for intentionally failing to pay him for all of the hours he worked as Ford's employee.

### Jurisdiction And Venue

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1367 (supplemental jurisdiction); and 29 U.S.C. § 216(b)(FLSA).

2.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2)(venue generally); and 29 U.S.C. § 216(b)(FLSA).

## Parties

3.      Plaintiff Rollin Dye is a former employee of defendant Ford Motor Company.  He worked at Ford's Chicago Assembly Plant, located on Chicago's far South Side, from August 2013 to January 2014 as a contractor, and then from January 24, 2014 to February 15, 2017 as an employee.

4.      Ford Motor Company is a Delaware corporation, authorized to do business in Illinois, and engaged in building automobiles at the Chicago Assembly Plant. Ford employs more than 200,000 workers, and as of 2016, has more than $237 billion in assets.

## Nature of the Case

5.      Dye brings this lawsuit as a collective action, on his own behalf and on behalf of other similarly situated current and former employees of Ford.  Ford automatically deducted compensable time from the time records of Dye and his fellow engineers, and required the engineers to work off-the-clock before and after their scheduled shifts, all which cost Dye and his colleagues lost wages.

## Dye Kept Paint Robots Running

6.      Ford considered Dye to be an "automation engineer," although his formal classification at Ford was "controls engineer," a misleading term because industry normally applies that title to a completely different job.

7.      Assigned to the paint area of the assembly plant, Dye kept approximately fifty robots working. The robots painted and applied sealant to cars.

8.      Dye's daily tasks included finding parts for the robots, teaching robot maintenance to union maintenance workers, and in general supporting the maintenance of the robots. The position was not supposed to include manual labor, but Dye performed many manual

2

tasks every day. For example, he would remove applicator cleaners, clean vacuum tubes, and carry parts to and from the assembly line.

9.     Dye did not directly supervise any employees, and if repair or manual work was to be performed on the robots, the protocol was for Dye to advise a maintenance supervisor, who then was to direct his union staff to do the work.  However, Dye often found himself requesting tasks directly from maintenance staff, and sometimes he would perform repairs or maintenance on the robots himself.

10.     Dye's associate's degree in electronics, which had focused on circuit boards and related components, did not prepare him for maintaining paint robots, although he had relevant industry experience prior to joining Ford.

11.     Ford provided some training to Dye and his fellow engineers, but the training was not extensive. One of his coworkers, who had no prior experience or training, was put on the job without supervision after three months' training.

### Dye's Supervisor Demanded A Half Hour Of Unpaid Work Every Day

12.     Ford classified Dye and his colleagues, who worked as automotive engineers, as salaried, non-exempt workers, and paid them some overtime pay for those they hours worked in excess of forty in given workweeks.

13.     Dye typically worked an average of sixty hours, and periodically seventy, hours per week. For his first six to twelve months, Dye's schedule was six days per week, twelve and a half hours per day. The extra half hour was for overlap between shifts. The thirty minutes were used as a hand-off period so pertinent information could be exchanged between co-workers regarding breakdowns and other shift information.

14.     In an effort to reduce overtime, the paint department management reduced the shift hours by thirty minutes so the day and night shift would no longer overlap. Dye's boss, the maintenance superintendent, instructed the paint department engineers to come in fifteen minutes before the start of the shift and to remain in the office for fifteen minutes after the shift to continue the hand-off of information, without being compensated for it.

15.     Dye's superintendent told him, "We can't pay you for it, but we still want you to come in for the shift change. I don't care about the non-exempt shit. This is what you need to do."

16.     Dye complained about working the same hours for less pay, but his superintendent told him, "I don't care, we need the overlap."

17.     Dye attempted to record the extra half hour but his superintendent would go into the time system and change Dye's recorded time from 12.5 hour to 12 hours.

**Ford Reduced Dye's Pay Every Day For A Half Hour Lunch That He Never Took**

18.     Dye and his fellow engineers carried a radio at all times. Every engineer was required to respond to every call for assistance, without exception. A supervisor would yell at any unfortunate engineer who failed to respond.

19.     Dye had no scheduled time for lunch. The engineers were not able to leave their jobs for lunch, due to the relatively constant radio calls for assistance on the line.

20.     Ford's timekeeping system automatically deducted one half-hour each day from the engineers' compensated time, presumably for a lunch break that they were never able to take.

21.     Ford provided "learning modules" to its employees, for view on electronic devices. One module was on the Fair Labor Standards Act, the federal law which guarantees overtime pay to covered employees.

4

22.     From Ford's FLSA learning module, Dye learned that, for an employer to deduct time from an employee's working hours for a lunch break, the employee must be relieved of all duties.

23.     Dye told his maintenance superintendent that he never took a lunch break. The superintendent responded that Ford paid Dye enough, and that the half-hour per day deduction was mandatory.

### Ford Treated Engineers In Other Parts Of The Chicago Plant The Same

24.     Ford employs engineers in other parts of the Chicago plant although, like Dye, their official title might be different, such as "process engineer."

25.     Other engineers like Dye work in the paint area, as well as in the parts, chassis, body shop, and final assembly areas of the facility.

26.     None of the engineers have assigned lunch breaks, all wear radios and all are required to respond to every call for assistance.

27.     All the engineers use the same Ford system for recording their time, and all have a half-hour deducted for a lunch break they cannot take.

28.     Dye's superintendent also supervised several of Dye's counterparts, who were subject to the same unpaid thirty minute "overlap" requirement as Dye.

29.     On information and belief, other engineers not supervised by Dye's superintendent were subject to the same unpaid shift overlap requirement.

30.     Dye brings this action on behalf of himself and on behalf of all others similarly situated, namely all engineers, regardless of their official title, whose responsibility it was to support production at Ford's Chicago Assembly Plant, excluding union maintenance workers and

their supervisors, and who were employed at the Chicago Assembly Plant during the period from
three years prior to the filing of this lawsuit until the present.

31.     Dye's consent to participate in an FLSA collective action is attached as Exhibit A
to this complaint.

**Count 1 – FLSA**
**Unpaid Overtime**
**Collective Action**

32.     Paragraphs 1 through 31 are incorporated by reference.

33.     The FLSA requires that employers pay all non-exempt employees one and one-
half times their regular hourly rate for each hour worked in excess of forty in a given workweek.
29 U.S.C. § 207.

34.     Ford was Dye and the other engineers' "employer," and Dye and the other
engineers were Ford's "employees," as those terms are defined by the FLSA. 29 U.S.C. § 203(d),
(e).

35.     Ford did not pay Dye and other engineers at the Chicago Assembly Plant for all
their hours worked in excess of forty per week because Ford:

a.     Deducted one-half hour per day for a lunch break that Ford prevented the
engineers from taking; and

b.     Required the engineers to work the fifteen minutes before and after their
scheduled shifts without pay.

36.     Ford's failure to pay Dye and the other engineers for all their overtime hours
violated the FLSA.

37.     Ford's management was aware that it was to pay time and a half to the engineers for all overtime hours that they worked, and that Dye and his fellow engineers were working hours for which they were not being paid at all.

38.     Ford's violation of the FLSA was willful.

39.     As the direct result of Ford's violation of the FLSA, Dye and his fellow engineers were damaged in the form of lost compensation.

**Count 2 – Unpaid Overtime**
**Illinois Minimum Wage Law**
**On Behalf of Rollin Dye**

40.     Paragraphs 1 through 31 are incorporated by reference.

41.     The IMWL requires covered employers to pay covered employees one and one-half times their regular rate of pay for all hours worked in excess of forty in a given workweek. 820 ILCS 105/4a.

42.     Ford was Dye's "employer," and Dye was Ford's "employee," as those terms are defined in the IMWL. 820 ILCS 105/3(c), (d).

43.     Ford did not pay Dye for all his hours worked in excess of forty per week because Ford:

a.      Deducted one-half hour per day for a lunch break that Ford prevented Dye from taking; and

b.      Required Dye to work the fifteen minutes before and after his scheduled shifts without pay.

44.     Ford's failure to pay Dye for all his overtime hours violated the IMWL.

45.     As the direct result of Ford's violation of the IMWL, Dye was damaged in the form of lost compensation.

### Count 3 – Unpaid Wages
### Illinois Wage Payment And Collection Act
### On Behalf Of Rollin Dye

46.     Paragraphs 1 through 31 are incorporated by reference.

47.     The Wage Act requires employers to pay employees according to their agreements.

48.     Ford promised to pay Dye one and one-half his regular hourly rate for all hours worked in excess of forty in a given workweek.

49.     Ford's promise to Dye took the form of its FLSA learning module, which explained that an employer, like Ford, cannot deduct time for a break from an employee, like Dye, unless the employee is relieved of all of his job duties during the break.

50.     Ford's promise to Dye also took the form of his being paid for the time he worked before and after his shift, prior to his superintendent making him work those times after Ford stopped paying Dye for them.

51.     By accepting Ford's promise to pay him for all hours worked, Dye created an enforceable agreement with Ford.

52.     By requiring Dye to work through his so-called lunch break, and by forcing him to work off the clock before and after his shift, Ford broke its agreement with Dye.

53.     Ford violated the Wage Act by breaking its promise to Dye to pay him for all hours worked.

54.     As the direct result of Ford's violation of the Wage Act, Dye was damaged in the form of lost wages.

Wherefore, plaintiff Rollin Dye, on his own behalf and on behalf of all others similarly situated, requests judgment in favor of him and other class members, awarding them:

A.      Damages for unpaid wages, calculated at a rate of one and one-half time their regular hourly rates of pay;

B.      Liquidated damages in an amount equal to their unpaid wages;

C.      An interest penalty equal to 2% per month from the date each unpaid wage payment was due;

D.      Plaintiffs' reasonable attorneys' fee; and

E.      The costs of this action.

### Jury Demand

Plaintiff Rollin Dye demands a trial by jury.

*/ s Andrew H. Haber*_____
One of Plaintiffs' Attorneys

Dennis R. Favaro
*dfavaro@favarogorman.com*
Andrew H. Haber
*ahaber@favorogorman.com*
Max Barack
*mbarack@favorogorman.com*
Favaro & Gorman, Ltd.
835 Sterling Avenue
Suite 100
Palatine, Illinois 60067
(847) 934-0060

# Exhibit <u>A</u>

**NOTICE OF CONSENT TO BECOME A PARTY PLAINTIFF IN A
COLLECTIVE ACTION UNDER THE FAIR LABOR STANDARDS ACT**

       By signing below, I represent to the Court that I have been employed by **Ford Motor Company** within the last three years, and in one or more workweeks was not paid all of the overtime wages owed to me under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* Through this Consent, I authorize the filing and prosecution of this Fair Labor Standards Act action in my name and on behalf of all persons similarly situated to me.

Name: _____
              (print your name)

Signature: _____